UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| STACEY A. MOORE, JOSEPH MOORE, and STACEY A. MOORE as next friend of K.M.,<br><br>    Plaintiffs,<br><br>    v.<br><br>MARION COMMUNITY SCHOOLS BOARD OF EDUCATION, MARY PAHEMIER, Principal, personally and in her official capacity, DANIEL BROCK, Vice Principal, personally and in his official capacity, and BRENDA GROOMS, as next friend of T.G.<br><br>    Defendants. | CAUSE NO. 1:04-CV-483 |

## MEMORANDUM OF DECISION AND ORDER

Before the court is Defendants' Marion Community Schools Board of Education's ("the School"), Principal Mary Pahemier's ("Pahemier"), and Asst. Principal Daniel Brock's ("Brock") (collectively, "the Defendants") Motion for Summary Judgment filed on May 2, 2006. Plaintiffs responded on June 6, 2006 to which the Defendants replied on June 16, 2006. For the following reasons, the Defendants' Motion will be GRANTED as to the federal claims. The state law claims will be DISMISSED without prejudice.

## Applicable Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

1

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990).   A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 2512; *In Re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir. 1988); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir. 1988); *Valentine v. Joliet Township High School District No. 204*, 802 F.2d 981, 986 (7th Cir. 1986).  No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party."  *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992)(quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986)).

Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute because the issue of fact must be genuine.  Fed. R. Civ. P. 56(c), (e).  To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407, 1411 (7th Cir. 1988).  The non-moving party must come forward with specific facts showing that there is a genuine issue for trial.  *Id*.  A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

**Factual Background**

There is substantial agreement between the parties as to the relevant facts pertaining to the

conduct at issue. Where there is a divergence, the court, as it must on summary judgment shall view the facts favorably to the non-movant plaintiffs.

At the time of the events giving rise to the Complaint, Plaintiff K.M. was a twelve year-old sixth grade student at Justice Thurgood Middle School in Marion, Indiana. K.M. resided with her mother and step-father, Plaintiffs Stacey and Joseph Moore (hereafter, "Mrs. Moore"and "Mr. Moore"). During the 2003-2004 school year, Defendant T.G. was a seventh grade student also attending Justice Thurgood Middle School. T.G. lived in the same neighborhood as K.M. and rode the same bus to school. Prior to the events relating to the lawsuit, these two girls were friends.

**The Notebook**

In November 2003, rumors began circulating that T.G. had a notebook which contained derogatory statements about K.M. The notebook also was alleged to contain a list of names whom T.G, who claimed to be bisexual, was going to beat up if they did not become her girlfriends. Mrs. Moore learned of the notebook from some of the neighborhood children and spoke with the school's guidance counselor, Mrs. Smith, about it. Mrs. Smith investigated the situation and confiscated the notebook from another student. The notebook did not contain a list as had been rumored but did contain a series of notes between T.G. and another student. Derogatory comments were written in the notebook about K.M. but they were not written by T.G. or any other party to this lawsuit. Further, none of the derogatory comments were of a sexual nature. Mr. and Mrs. Moore both met with Mrs. Smith about the incident. Mrs. Smith advised the Moores that she believed the incident to be typical "kid's stuff" and nothing more. In her deposition, Mrs. Moore agreed that based on this incident alone, the school did not have cause to discipline T.G.

**The Rumor**

3

In late February 2004, K.M. came home from school crying because another student told her that T.G. had stated that she had "fingered" K.M. Although this statement was not made on school grounds, the statement as well as a rumor that K.M. was a lesbian began making its way through the school and eventually to K.M. K.M, confronted T.G. about the statement near the school cafeteria and T.G. responded, "yeah, we had fun didn't we?" The following day Mr. and Mrs. Moore reported the incident to Pahemier, who, in turn, referred the matter to Brock, for investigation as he was the Title IX officer for the school. On February 27, 2004, Brock met with K.M and helped her prepare a formal sexual harassment complaint. He then proceeded to interview the girls in the presence of Pahemier. His written notes from the meeting reflect the following:

> I asked what she had said to [K.M.]. She told me that everybody was saying that [K.M.] was spreading rumors about her being in bed with another girl. I asked her again what she said. After some back and forth chitchat, she admitted that she had stated she had fingered [K.M.]...
> After the interaction, I stated that I did have a complaint. I explained the consequences to T.G. if it happened again; I explained to [K.M.] the consequences if she allowed it to happen without telling us. I informed both girls that their parent[s] would be contacted to let them know of the complaint and possible consequences...We stressed the need to leave each other alone and to not make any comments either direction that were not of a positive nature...
> We asked if the girls needed a different seating arrangement on the bus. Both agreed that they would leave each other alone and that no seating changes would need to be made. After some additional encouragement to leave one another alone, we sent the girls back to class.

(Pltf's Supp. Exhibit 3 at p. 39)

At the conclusion of this meeting, Brock telephoned Mrs. Moore and explained that he had issued T.G. a verbal warning as is called for under the School's Sexual Harassment Policy (the "Policy"). Mrs. Moore was unhappy with this action by Brock and believed a more severe consequence was warranted. In his notes, Brock summarized the conversation:

4

>Mrs. Moore was upset that I had only given a warning, stating that the student-parent signature regarding acceptance of the handbooks should qualify as a warning. She felt that a warning was not sufficient and paramount to do nothing. I told her that I had dealt with about 30 cases in the last few years and that I have had only about two recurrences in the last two years. A warning usually takes care of the problem. She stated that she was unhappy and that her husband would be coming to the school to talk to us about it.

(*Id.* at pp. 39-40). Mr. Moore did, in fact, meet with Brock and Pahemeir and was told that the Policy had been followed, a verbal warning had been given, and that the Policy would continue to be enforced if future incidents occurred. Mr. Moore remained unhappy with this resolution.

Because the Moores were unhappy with the resolution and rumors were continuing to be spread around the school, Brock continued to investigate the incident by talking with other students. It was at this point that Brock learned that the original statement T.G. made (the one that started this brouhaha) was said off school grounds to another student over the telephone who, in turn, repeated the statement at school. According to Brock, he believed that he only had jurisdiction to address the conversation that occurred at school between K.M. and T.G. wherein K.M. confronted T.G. about having made the statement. Brock explained:

>What was said at school is 'did you finger me?' 'Yeah and we had fun didn't we,' or something to that effect...I did an investigation that a child approached another child and asked if she had said that she had fingered her and the other child said, 'yes, and we had fun, didn't we?' That's what I was investigating...[B]ecause the phone call was done at home, I had no jurisdiction.

(Pltf's Supp. Exh. 3 Brock Dep. at 60-64).

During this investigation, Brock also learned that rumors were also being spread by K.M. about T.G. According to Brock, he learned that K.M. was spreading rumors to others at school that she had a videotape of T.G. in bed with a special education student. Brock became concerned

5

upon learning this and interviewed the special education student as well as other students who allegedly viewed the video to determine whether the rumor had substance. Brock investigated these rumors even though T.G. did not complain to him about them nor did she file a harassment complaint. Nevertheless, Brock investigated the complaint out of concern that something inappropriate was occurring that may require the intervention of social services.

> ...[W]hen a child goes to another child and says, 'Did you spread the rumor that ...you fingered me?' And, she says, 'Yeah, and we had fun,' that's street talk. That's a ... that's an embarrassed reaction to a comment, in my opinion. But, when a child is videotaping another child in bed with another student and alleges that it happened ...and her father knows about it, and things of that nature, that can be pretty serious and that can be a ... a cause for me to have to call the uh, Family Services and everything else. There was a ... a...uh, it's much more severe than the first comment.

Pltf's Supp. Exh. 3 Brock Dep. at p. 67). Ultimately, Brock determined that the rumors regarding the videotape were false and did not pursue the matter further. He did believe, however, that the situation between the two girls was a "two-way street" in that each girl was spreading rumors about the other. (*Id.* Brock Dep. at p. 68).

Brock concluded his investigation on March 3, 2004 and drafted a letter to the Moores explaining that the original statement made by T.G. had been made outside of school grounds and that he lacked jurisdiction to discipline T.G. for that particular statement.

On March 1, prior to receiving the letter from Brock, the Moores removed K.M. from the school because the situation, in their view, was escalating and the environment was unsafe for K.M.. K.M. continued to be harassed by other students because of the rumor started by T.G. At some point (the record is unclear as to the date), the Moores contacted an attorney regarding the harassment that was ongoing at the school.

6

On March 9, 2004, the Moores met with the Title IX officer for the school system, Kim Knott and learned that T.G. had been removed from the school for reasons unrelated to the sexual harassment complaint filed by K.M.  K.M. returned to school on March 30, 2004 but continued to be harassed by other students.

On April 5, 2004, Brock met with the 6th Grade team which consisted primarily of teachers who taught language arts, science, social studies, and math, in an attempt to eliminate the harassment from other students toward K.M. :

> ...[F]irst of all, I talked to the 6th Grade team and told them what was going on, and why it was going on.  I asked them to uh, be very aware of K.M.... and any interaction that was taking place that would be contrary to her well being...I then issued... a memo to all 6th Grade teachers, anyone who had contact with the child, and put her picture on it, so they would know who I was talking about, and said that 'if you see anyone bothering this child or mistreating this child, please report to me directly.

(Brock Dep. at 79).  In addition to meeting with the teachers, Brock talked with some of the children on the bus and asked them to leave K.M. alone:

> A.  I talked to some of the children on the bus who were, uh, very anti-[K.M.] and I asked them, point blank, 'Please, leave the child alone. She's having a hard time right now, and I need you to help me out. Would you please just, if you have a problem with her, come see me, don't badger her.'
> Q.  Did that work?
> A.  I think it helped.  I did some other investigating to determine what other children might be bothering her.  And, whenever I found that a child was spreading a rumor, or talking about [K.M.], I directed them to stop, that this matter had to be dropped.

(Brock Dep. at 86).

K.M. did not finish the school year at Justice.  She presently attends school in a

7

neighboring district.

**<u>The Bus Referrals</u>**

Beginning in October 2003, T.G. received numerous "bus referrals" or disciplinary write-ups, for her behavior on the school bus. T.G. received referrals for cussing, touching other kids on the bus, and for discussing "personal business" with others on the bus. One of the disciplinary referrals dated November 14, 2003, lists "sexual harassment" as the offending conduct. The referral, written by a bus aide, reads:

> T.G. is talking about kissing and making out with another girl. She also stated to a boy, 'you would have cared if you had seen what I was doing with your girlfriend last night.' She talks about this every day to and from school.

(Pltf's Supp. Brock Dep. Exhibit 4). According to Asst. Principal Brock, he received a copy of these disciplinary referrals and suspended T.G. from bus privileges for two weeks regarding one of the referrals and for nearly a month for the November 14 incident.

Premised on these facts, the Moores filed the instant lawsuit contending that the School engaged in sex discrimination in violation of Title IX of the Education Amendment of 1972, 20 U.S.C. §1681. In addition, the Moores claim that the Pahemier and Brock infringed K.M.'s constitutional rights under the Equal Protection Clause of the Fourteenth Amendment in violation of 42 U.S.C. §1983. The Moores also allege claims under Indiana state law including claims for battery, emotional distress, and negligence.[1]

## DISCUSSION

---

[1] Brenda Grooms, as next friend of T.G., has also been sued in this case for state law battery, infliction of severe emotional distress, and defamation. No motion for summary judgment was filed by her relating to these claims.

As noted above, Plaintiffs assert two federal law claims:(1) a claim for violation of Title IX, 20 U.S.C. § 1681, against the School;[2] and (2) a claim for violation of K.M's right to equal protection under the law as provided by the Fourteenth Amendment against all defendants pursuant to 42 U.S.C. § 1983.  These claims shall be addressed in turn.

**Federal Claim under Title IX**

Title IX of the Education Amendments Act of 1972 ("Title IX"), as amended, states, in relevant part, that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."20 U.S.C. § 1681(a).  In *Davis v. Monroe County Board of Education,* 526 U.S. 629 (1999), the Supreme Court held that public schools, as recipients of federal funds, can be liable under Title IX for student-on-student sexual harassment "but only where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities" and "only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id.* at 633, *see also Murrell v. School Dist. No. 1,* 186 F.3d 1238, 1246 (10th Cir.1999) (discussing the elements of a Title IX peer harassment claim under *Davis* ).  Thus, the private right of action only lies where the school district is deliberately indifferent to known acts of sexual harassment and the harasser is under the school's disciplinary authority. *Id.* at 633. Where a school district does not engage in sexual harassment directly, it may not be liable for damages unless its

---

[2]There is some discussion in the briefs as to whether Plaintiffs intended to assert a Title IX claim against the individual defendants as well as against the School.  In their responsive brief, the Plaintiffs concede that no claim lies against the individual defendants under Title IX.

deliberate indifference makes a student vulnerable to or causes them to undergo harassment. *Id.* at 644-45. Deliberate indifference to acts of peer sexual harassment arises only where the school district's response or lack of response to the harassment is clearly unreasonable in light of the known circumstances. *Id.* at 648.

In this case, the court must first examine the alleged conduct at issue here. The Seventh Circuit has endorsed looking to Title VII law to determine whether the alleged sexual harassment is sufficiently severe or pervasive to constitute illegal discrimination on the basis of sex under Title IX. *Hendrichsen v. Ball State Univ.,* 107 Fed.Appx. 680, 684 (7th Cir. Aug.19, 2004); *Smith v. Metro. Sch. Dist. Perry Twp.,* 128 F.3d 1014, 1023 (7th Cir.1997). Whether gender-oriented conduct rises to the level of actionable harassment in Title IX cases " 'depends on a constellation of surrounding circumstances, expectations, and relationships,' " *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), including, but not limited to, "the ages of the harasser and the victim and the number of individuals involved." *Davis,* 526 U.S. at 651, 119 S.Ct. 1661 (parallel citation omitted). "The relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity. Peer harassment, in particular, is less likely to satisfy these requirements than is teacher-student harassment." *Id.* at 653, 119 S.Ct. 1661. Further, the Supreme Court has cautioned courts as follows:

> Courts, moreover, must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults. Indeed, at least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not

>available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender. Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.

*Davis*, 526 U.S. at 651-652.

In this case, it simply cannot be emphasized enough that this case is spurred by the conduct of pre-pubescent eleven year old girls who are still developing the skills necessarily to appropriately interact with their peers while on the verge of significant physical and hormonal changes. This court has no doubt that the rumor started by T.G. that spread throughout the school was a subjectively mortifying event for K.M. Indeed, "[p]ublic schools are places where impressionable young persons spend much of their time while growing up...During the time they do-from first grade through twelfth-students are discovering what and who they are. Often, they are insecure. Generally, they are vulnerable to cruel, inhuman, and prejudiced treatment by others." *Harper v. Poway Unified School Dist.* 445 F.3d 1166, 1176 (9th Cir. 2006). This sort of treatment has become so commonplace in schools that similar conduct to that alleged here, namely gossiping and starting rumors at school, was the subject of a recent Paramount Pictures movie entitled *Mean Girls* (Paramount Pictures 2004).

As unfortunate and common as this situation is, given the nature of the alleged harassment here, the court cannot conclude that it rises to the level of actionable harassment.[3] When the evidence in this case is viewed most favorably to the Moores, the evidence shows that T.G. started a rumor about K.M.'s sexual orientation off-campus which was repeated within the school by other students.

---

[3] The court is sympathetic to the fact that middle school is a difficult enough adventure for parents and children without the added pressure of dealing with rumors and questions about one's sexual orientation.

11

K.M. confronted T.G. about the rumor and T.G. retorted with a smug remark which, it appears, became part of the rumor. There can be no doubt given the age and social development of these children that having rumors of one's sexual orientation being circulated through a middle school is humiliating and offensive. Yet, this isolated event, without more, is simply not the type of conduct that is so severe and pervasive that it rises to the level of actionable sexual harassment. Indeed, the conduct complained of and the school's reaction to it is far less egregious than that of other cases that have failed to meet the Title IX standards. *See*; *Hawkins v. Sarasota County School Bd.* 322 F.3d 1279, 1288 (11th Cir. 2003) (describing the conduct of the 8 year-old perpetrator as persistent, continual and included sexually explicit and vulgar language and acts of objectively offensive touching); *Gabrielle M. v. Park Forest-Chicago Heights, IL. School Dist.* 163, 315 F.3d 817, 822 (7th Cir. 2003)(general allegations by kindergarten student that another kindergarten student had "bothered" her by doing "nasty stuff" insufficiently severe and pervasive to give rise to Title IX violation since "such allegations are as indicative of nonactionable teasing and name calling as they are of potentially actionable harassment"); *Theno v. Tonganoxie Unified School Dist. No. 464,* 394 F.Supp.2d 1299 (D.Kan.,2005)

(actionable harassment where student harassed for years by other pupils who resorted to crude gestures, teasing, and name calling with sexual innuendos and undertones in an effort to debase and derogate the student's masculinity); see, e.g., *Manfredi v. Mount Vernon Bd. of Educ*., 94 F.Supp.2d 447, 454-55 (S.D.N.Y.2000) (finding a single incident of offensive touching between first graders insufficient to rise to the level of severe, pervasive, and objectively offensive conduct given the *Davis* Court's cautionary statement that it was "unlikely Congress would have thought such behavior sufficient ⋯ in light of the inevitability of student misconduct and the amount of litigation that would

12

be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment."); *Vance v. Spencer County Public School Dist.,* 231 F.3d 253, 259 (6th Cir. 2000)(describing physical attacks on sixth grader by male peers as well as a long string of vulgarities, name calling, false imprisonment, episodes of exposing genitalia).  What is present in this case is, in essence, a single incident with T.G. that spawned a series of rumors from other students about K.M. which, in turn, made her school life difficult and unpleasant.  Unlike the more severe cases listed above, there is no evidence in this case of harassment or name-calling over a prolonged time frame and no evidence at all of physical contact or repeated sexually charged contact.  Accordingly, the court concludes that the conduct alleged here is not sufficiently severe and pervasive so as to be actionable harassment under Title IX.

Even if, however, the court assumed that the conduct here constituted actionable harassment, the outcome is no different since the school took action to remedy the alleged harassment. A school district is liable for damages under Title IX only where the district itself remains deliberately indifferent to known acts of harassment. *Davis,* 526 U.S. at 642-43, 119 S.Ct. 1661. In describing the proof necessary to satisfy the standard, the Supreme Court has stated that a plaintiff may demonstrate the school district's deliberate indifference to discrimination "only where the [school district]'s response to the harassment ⋯ is clearly unreasonable in light of the known circumstances." *Id.* at 648, 119 S.Ct. 1661. This "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Id.* Victims do not have a right to seek particular remedial demands and courts should not second guess school administrators' disciplinary decisions. *Id.*

From the record set forth here, the School was clearly not deliberately indifferent to the alleged

13

discrimination.  Asst. Principal Brock investigated K.M.'s complaint of harassment immediately, interviewed the two girls involved, counseled them on the consequences of continued sexually harassing behavior and notified T.G.'s parents of the conduct and warned that further instances of harassment would result in suspension.  These were meaningful measures to eliminate the harassment and, reasonably calculated to end the harassment.  Asst. Principal Brock testified that in the past, such measures were, in fact, successful in eliminating sexual harassment and thus, he had no reason to believe that the same would not be true in the present case.  Moreover, when the Moores complained that other students were contributing to the harassment by repeating rumors at school, Asst. Principal Brock met with the 6th Grade team to advise them on the situation and to have them be on the lookout for inappropriate behavior directed at K.M. and he spoke with students who were spreading the rumors and asked them to stop the behavior.

The gist of the Moores' position is that the School should have immediately suspended T.G. and, apparently, any other student that was caught spreading the rumor promulgated by T.G. However, Asst. Principal Brock was correct that his authority to discipline T.G. for comments made off-campus was more limited than it was for conduct occurring on school grounds.  *See, e.g., Boucher v. School Board of the School District of Greenfield*, 134 F.3d 821, 828 (7th Cir.1998) ( "school officials' authority over off-campus expression is much more limited than it is over expression on school grounds"); *Klein v. Smith*, 635 F.Supp. 1440 (D.Me.1986) (student's vulgarity directed at teacher off school premises was "too attenuated to support discipline").  And, even assuming that the original harassing behavior was made at school, his obligation under Title IX is to take prompt remedial action that is not clearly unreasonable.  This court cannot second guess the School's chosen response where, as here, the methods employed were reasonably calculated to end the harassment.

14

In fact, the record is void of any evidence that T.G. continued to harass K.M. once she received the verbal warning.[4]  Accordingly, the Defendants' Motion for Summary Judgment on the Title IX claim is GRANTED.

**Section 1983 Claim**

Section 1983 is not a source of substantive rights; it merely provides a method for vindicating federal rights conferred elsewhere. *Graham v. O'Connor,* 490 U.S. 386, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (quoting *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 2694 & n. 3, 61 L.Ed.2d 433 (1979)). In a § 1983 action, the plaintiffs must allege that they was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *American Manufacturers Mutual Insurance Co. v. Sullivan,* 526 U.S. 40, 119 S.Ct. 977, 985, 143 L.Ed.2d 130 (1999). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Graham,* 109 S.Ct. at 1870. Here, Plaintiffs allege that the defendants violated K.M.'s right to equal protection guaranteed by the Fourteenth Amendment by failing to protect her from sexual harassment.

In response, the Defendants contend that school officials and employees cannot be sued under § 1983 for a violation of Title IX under the theory that Title IX subsumes §1983.  Indeed, the Second, Third, Fifth, and Seventh Circuits have concluded that a Title IX claim precludes remedies under § 1983 under the theory that Title IX provides sufficiently comprehensive remedial devices in that it allows a Plaintiff to recover equitable as well as money damages under Title IX , that it precludes remedies also under § 1983.  *See Bruneau v. South Kortfight Central School Dist.,* 163 F.3d 749 (2nd

---

[4]Although T.G. was eventually removed from school, there is no evidence that this suspension was related to sexually harassing conduct toward K.M. or anyone else.

15

Cir.1998); *Pfeiffer v. Marion Center Area School Dist.,* 917 F.2d 779 (3rd Cir.1990); *Lakoski v. James,* 66 F.3d 751 (5th Cir.1995); *Waid v. Merrill Area Public Schools,* 91 F.3d 857 (7th Cir.1996); *Boulahanis v. Board of Regents,* 198 F.3d 633 (7th Cir.1999).[5]

In *Boulahanis v. Board of Regents* 198 F.3d 633, 640(7th Cir.1999), the plaintiffs, former members of the Illinois State University men's soccer team sued the University and several University officials after the University eliminated the men's soccer program to achieve proportionality under Title IX. The suit included §1983 claims against the University officials for sex discrimination. After the district judge granted summary judgment in the defendants' favor, the plaintiffs appealed claiming, among other errors, that the district court erred.by holding that the section 1983 claims against the University officials were preempted by Title IX. More particularly, the plaintiffs argued that because Title IX permits suits only against entities, it could not preempt individual section 1983 claims. In rejecting this argument, the Seventh Circuit wrote:

> By focusing on the availability of a claim against individual defendants, the Plaintiffs-appellants misconstrue the doctrine of preemption. In providing for the remedies available under Title IX, Congress has created a regime for the redress of sex discrimination in athletic opportunities at federally-funded institutions. In order to be comprehensive, that regime need not include possible claims against both the institution and individuals involved. The fact that individual claims are not available under Title IX means that Congress has chosen suits against institutions as the means of redressing such wrongs. *See Middlesex Cty. Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 20, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (holding that "[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983"). As we noted in *Waid*, in establishing Title IX, "Congress intended to place the burden of compliance with civil rights law on educational institutions themselves, not on the individual officials associated with

---

[5] The Sixth, Eighth, and Tenth Circuits have allowed § 1983 constitutional rights claims to proceed independent of Title IX claims. *See Lillard v. Shelby County Board of Educ.,* 76 F.3d 716 (6th Cir.1996); *Crawford v. Davis,* 109 F.3d 1281 (8th Cir.1997); *Seasons v. Snow,* 84 F.3d 1226 (10th Cir.1996).

>those institutions." *Waid*, 91 F.3d at 862. Here plaintiffs-appellants have a Title IX claim against Illinois State University. Under our holding in *Waid*, the district court was correct in determining that the availability of that claim preempts the remedies available for sex discrimination under Section 1983.

*Boulahanis*, 198 F.3d at 640.

Plaintiffs do not dispute the general preemption principle set forth in the above cases, but they do contend that this principle is not applicable to their §1983 claims based on sex discrimination. It appears that Plaintiffs are contending that because Title IX applies only to entities receiving federal funding, it cannot preempt an individual claim under section 1983 against school employees who are not administrators responsible for enacting the policies but who violate the constitutional rights of a student. *See Delgado v. Stegall,* 367 F.3d 668, 673 (7th Cir. 2004).

In *Delgado,* the Seventh Circuit held that a university student could sue her professor for sexual harassment under § 1983. However, with respect to the university, the Court noted that Title IX "furnishes all the relief that is necessary to rectify the *discriminatory policies or practices of the school itself." Delgado,* 367 F.3d at 674 (emphasis added). Preclusion does not occur when the teacher engages in abuse that is not a policy or practice for which a school could be held liable under Title IX. *Id.* Thus, the distinction between teacher and school official becomes "crucial" when determining whether § 1983 claims are preempted by Title IX. *Id.*

Here, plaintiffs attempt to distinguish the preemption cases by arguing that unlike the University officials in *Boulahanis* and *Waid*, Asst. Principal Brock and Principal Pahemier were not school "officials" responsible for enacting the School's sexual harassment policy. Rather, they were charged with the responsibility of enforcing the policy which they did not do effectively. This reasoning, however, is precisely why Title IX preempts the §1983 claim against these individuals.

17

As in both *Boulahanis* and *Waid*, the actions taken by officials in this case were dictated by a school policy or practice that prohibits sexual harassment.  These officials intervened in an attempt to eliminate harassment directed at K.M. by her peers.   Unlike *Delgado*, where the teacher was accused of sexually harassing the plaintiff thereby committing an independent tort for which the school could not be held liable under Title IX, there is no allegation here that either of the school administrators acted in a manner that was independently tortious.  The most that is alleged is that these officials, in an attempt to eliminate the sexual harassment complained of by K.M., created an environment between K.M. and her peers that was as bad as the sexually harassing conduct which gave rise to the involvement of the school administrators in the first place.  Yet, to hold that unsuccessful attempts to remedy harassment against a student is independently tortious so as to support an individual §1983 claim puts administrators and teachers in a box.  If the school official is aware of the harassment, there is an obligation to remedy it or face liability under Title IX.  But, where as here, clearly reasonable steps are taken to remedy the harassment and the harassment continues despite the administrator's best efforts, the administrator faces potential individual liability under §1983 even though Title IX's requirements have been met.  This court cannot conclude that Congress intended such a result in fashioning Title IX.  As a result, the court concludes that the logic of *Delgado* does not apply and the section 1983 claim alleging a violation of the equal protection clause of the Fourteenth Amendment is preempted.  Defendants' Motion for Summary Judgment is therefore GRANTED as to this claim.

**State Law Claims**

Since this Court is granting summary judgment in favor of the defendants on all claims over which it had original jurisdiction the court has the discretion to dismiss the remaining state claims

pursuant to 28 U.S.C. § 1367(c)(3). "A district court should consider and weigh the factors of judicial economy, convenience, fairness and comity in deciding whether to exercise jurisdiction over pendent state-law claims." *Wright v. Associated Insurance Companies, Inc.*, 29 F.3d 1244, 1250 (7th Cir. 1994) (citations omitted). "In the usual case in which all federal claims are dismissed before trial, the balance of these factors will point to declining to exercise jurisdiction over any remaining pendent state-law claims." *Id*.

This Court has considered the factors of judicial economy, convenience, fairness and comity and must conclude that the balance of these factors does not warrant that this Court retain jurisdiction over a state-law claim. As the Seventh Circuit in *Wright* made clear "[a] district court should have a good reason for retaining jurisdiction and therefore should make a finding as to the balance of judicial economy, convenience, fairness and comity to justify retention." *Wright* at 1251. Here the Court finds no such good reason and plaintiff has provided none. The state law claims will therefore be dismissed WITHOUT PREJUDICE.[6] This includes the state law claims filed against Brenda Grooms, as the next friend T.G.

## **CONCLUSION**

Today's public schools are in the unenviable position of having to carefully tow the line between moral, social, and family issues affecting students while simultaneously meeting the educational demands dictated by both state and federal authorities. When, as here, the record discloses that school officials were not "clearly unreasonable" in their response to gender-based complaints about which they were aware, it is not this court's job to second guess the judgment of

---

[6] The dismissal of the supplemental state law claims should expressly be without prejudice so that the plaintiffs may refile the claims in the appropriate state court. *Bass v. Parkwood Hosp.,* 180 F.3d 234, 246 (5th Cir.1999).

19

the administrators. Accordingly, the Defendants' Motion for Summary Judgment is GRANTED as to the Title IX and §1983 claims against the School, Defendant Brock, and Defendant Pahemier. The state law claims as to all defendants are DISMISSED WITHOUT PREJUDICE. The clerk is directed to enter judgment in favor of the Defendants.

SO ORDERED.

This 19th day of July, 2006

William C. Lee
United States District Court
Northern District of Indiana